Filed 11/20/15  P. v. Molina CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066260 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS265024) |
| HECTOR PABLO MOLINA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed as modified.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant of second degree murder and the trial court sentenced him to an indeterminate term of 15 years to life. Defendant contends the trial court erred by limiting his ability to impeach the prosecution's star witness with evidence that the witness was currently under investigation for stalking an ex-wife. He also contends the prosecutor violated her *Brady*[1] obligations by failing to disclose the full substance of that investigation. Defendant further contends the trial court erred by denying his motion to dismiss, which was premised on his claim that the arresting officers should have preserved his blood alcohol level by taking a blood sample at the time of arrest. In a related argument, defendant contends the court erred by excluding his expert witness, who would have testified that police should have taken a blood sample from defendant. We reject these claims of error. However, we accept defendant's unopposed claim the trial court erred in its calculation of defendant's presentence custody credits and will direct the trial court to amend the abstract of judgment accordingly. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Prosecution Case*

Jerry Macagno testified that he and defendant had been friends for many years. Macagno rented a space on his property on Hollister Street to defendant so that defendant could park his motor home there. Defendant stayed in the motor home most of the time, but sometimes stayed at his mother's home on Clairton Place.

---

[1] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

On June 3, 2013, Macagno and defendant spent the day together.  They went to a bank so defendant could withdraw money to pay rent to Macagno, and had lunch at a fast-food restaurant.  While running these errands, a prostitute propositioned them.  Defendant offered to procure her services for Macagno, but Macagno declined.  When they returned to Macagno's home, they watched pornography and drank shots of bourbon.  Altogether, they consumed up to one and one-half flask-sized bottles of bourbon.[2]

Macagno said defendant began making phone calls to arrange for prostitutes to come to Macagno's house.  Defendant became increasingly agitated as he was unable to reach the parties he was calling.  Defendant said "he wanted to kill the guy" and made a striking or stabbing gesture.  Sometime that day or the day before, Macagno had given defendant a hunting knife, which Macagno saw defendant put in the glove box of defendant's truck.  Defendant then got in his red Dodge truck and drove off.

Melvin Breaux testified that on June 3 he was homeless and lived in a tent near the Strawberry Fields area of Chula Vista.  About two months earlier, he befriended another homeless man, David Craig, who had been living in an inoperable van in Strawberry Fields for about three years.  On June 3, Breaux and Craig were sorting bottles for recycling.  About 3:00 p.m., defendant drove up in his truck.  Breaux had never seen defendant before, but Craig appeared to know him.  Craig casually walked toward defendant and said, "What's up, Big John?"  Defendant had his hands in his jacket.  Breaux returned to sorting bottles, but later looked up and saw that Craig was bent over

---

[2]    Police photographed, but did not collect, two empty flask-sized bottles of bourbon in Macagno's trashcan.

and defendant had him in a headlock.  When defendant released Craig, Craig fell to the ground saying, "I don't know why you did that to me.  I never done nothing to hurt you," or "[W]hy did you do that to me Big John?  I never done nothing to hurt you."  Defendant was holding a bloody hunting knife.  He walked back to his truck and drove away.

As defendant drove off, Breaux wrote the license plate number in the dirt.  Breaux walked to the area behind a nearby apartment complex and borrowed someone's phone to call 911.[3]  Chula Vista police officers arrived within minutes, but Craig was declared dead at the scene.  Breaux flagged down one of the arriving officers, recounted what had happened, and drew a picture of defendant's knife.

Using the license plate information Breaux had captured, police identified a nearby address and broadcast a be-on-the-lookout for defendant's truck.  Two San Diego police officers responded to the broadcast that afternoon and saw defendant's unoccupied truck parked near his mother's house.  They saw defendant get in his truck and drive off; they tailed him until he parked in Macagno's driveway.  After a while, defendant backed the truck out of the driveway and struck a vehicle that was stopped at a red light.  The officers intervened and noticed blood on defendant's pants and shoes.  One of the officers also saw a hunting knife between the driver's and passenger's seat of defendant's truck.  The officers detained defendant for the Chula Vista police.  When defendant was

_____

[3]    Apartment resident Rosie Valenzuela testified she loaned her phone to Breaux to call 911.  She also testified she saw a truck at the crime scene, but when shown pictures of defendant's truck, she said she did not think they were the same.

4

arrested, he had blood on his hands, shoes, pants, socks, and leg. There was also blood on the truck's steering wheel and ignition switch.

Chula Vista police drove Breaux to where defendant was detained. Breaux identified defendant with 100 percent certainty as the person who stabbed Craig. Breaux also saw defendant's truck and said, " 'I think that's the truck that the guy was driving.' "

While defendant was being booked into jail, he was crying and loudly said, "I can't believe I'm here for hitting that lady's car. Is she okay?" and "God, please forgive me" or "God, please help me."

Chula Vista police detectives Michael Varga and Ricardo Cruz interviewed defendant at the police station about 10:30 p.m. on June 3. Defendant initially provided a detailed accounting of his day, which had him running a variety of errands, none of which involved the victim or Strawberry Fields. When asked to explain why witnesses had seen him and his truck in Chula Vista when he claimed to be at Macagno's house, defendant changed his story and acknowledged he "might have been in . . . the wrong place at the . . . wrong time" and "saw somebody else . . . do something that . . . was a tragedy . . . ." Defendant claimed he stopped at Strawberry Fields to urinate while picking up dinner for his mother. While there, defendant heard Craig moaning and saw him on the ground. Defendant had never seen Craig before and did not know who he was. Defendant lifted Craig's body to see if he was alive, but "he didn't seem to be." Defendant said he locked eyes with a Mexican man wearing a gray cap, blue jeans, and a striped shirt. The man ran away and defendant got back in his truck and left. Defendant acknowledged Macagno had recently given him the hunting knife and that he (defendant)

5

had shown it to his mother June 2. Defendant had no explanation for how, if the knife had been used in Craig's murder, it ended up in his truck.

When asked about a possible motive for Craig's killing, defendant told the detectives he thought the suspect was "a junkie" he might have done drugs with once in the past. Defendant claimed he had been clean for six months.

A pathologist testified that Craig died from a six-inch-deep stab wound that penetrated his ribs, lungs, and heart. The stab wound was consistent with being caused by the knife that was recovered from defendant's truck. DNA evidence confirmed that the blood found on the steering wheel, defendant's shoes, and the knife belonged to Craig. Law enforcement witnesses testified that tire and shoe tread imprints at the crime scene matched the tires on defendant's truck and tread on defendant's shoes.

*The Defense Case*

Defendant testified in his defense. He said he got drunk on eight to 10 shots of bourbon at Macagno's house while watching pornography. Defendant made several phone calls in an unsuccessful attempt to summon prostitutes. Defendant then went to Strawberry Fields, where he had previously bought drugs and used prostitutes.

Defendant claimed he knew both Craig and Breaux from their involvement in the drug trade at Strawberry Fields: Craig sold clean syringes and Breaux was a "doorman" who kept guard for a drug dealer named Paul. Two days before Craig's murder, defendant purchased a syringe from Craig, purchased drugs from Paul, and had sex with a prostitute Breaux provided.

6

On June 3, defendant went to Strawberry Fields to buy drugs and obtain prostitutes. He purchased a syringe from Craig and then, with Breaux's help, purchased drugs from Paul. Defendant got high with a prostitute and used her services. As he was leaving, he gave Craig some drugs as a tip and returned to his truck. Defendant remembered he had a used syringe in his pocket and started to walk back into the fields to put it in a tree where people leave used needles.

Defendant heard a "commotion" around Craig's van. Defendant saw a man leaving and Craig lying in a pool of blood. Defendant lifted Craig's body, but heard his "last gasp." Defendant said he saw a man leaving Strawberry Fields. The man looked at defendant, so defendant "got the hell out of there as fast as [he] could." Still drunk and high, defendant returned to Macagno's house to stash some of his leftover drugs.

Defendant testified he did not see the knife in his truck and did not know how it ended up there. He acknowledged Macagno had given him a hunting knife earlier, but claimed he gave it to Breaux two weeks earlier in exchange for drugs.

Defendant testified he lied during his interview with detectives to protect his drug connections. He claimed he was still drunk and high during the interview and did not remember what he said or why he answered the way he did.

Defendant called two additional defense witnesses. Rosa Valenzuela (the mother of the woman who loaned her phone to Breaux) testified she saw a red Ford truck near Strawberry Fields around the time of the murder that did not resemble photographs of defendant's truck. Defendant's cousin, Bertha Luna, testified she smoked drugs with

7

Breaux on several occasions,[4] and heard Breaux's associates state that Breaux told the police that defendant had killed someone "they had killed."

## *Jury Verdict and Sentence*

The People charged defendant with the first degree murder of Craig and further alleged defendant's personal use of a knife. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).)[5] The jury found defendant guilty of second degree murder and made a true finding on the knife-use enhancement. The trial court sentenced defendant to an indeterminate term of 15 years to life and credited him with 382 days of presentence custody.

## DISCUSSION

## I. *Investigation of Breaux*

Defendant contends the trial court committed a variety of errors in its handling of the defense's requests to impeach Breaux on the basis that he was being investigated for stalking his ex-wife. He contends the court erred by (1) failing to disclose what it learned during an in camera examination of the detective leading the stalking investigation and refusing to allow discovery of his investigative file; and (2) refusing to allow defendant to impeach Breaux with the stalking investigation. Defendant also contends the prosecutor committed a *Brady* violation by failing to disclose the substance of the stalking investigation to the defense. We reject these contentions.

---

[4]   Breaux testified he smoked drugs with Luna "[m]aybe once."

[5]   Further unspecified statutory references are to the Penal Code.

8

## A. *Proceedings Below*

The primary defense theory at trial was that Breaux was framing defendant for Craig's murder or was somehow otherwise involved. Defense counsel vigorously cross-examined Breaux and impeached him on several points. For example, defense counsel elicited that Breaux (1) initially described the suspect as having a pony tail and wearing denim shorts and work boots, when none of that was true of defendant; (2) said Craig addressed the perpetrator as "Big John," when defendant has never gone by that name; (3) initially denied using drugs, but later admitted smoking drugs with Luna on one occasion (which Luna further impeached by testifying they had used drugs together six times); (4) was receiving room and board from the district attorney's office under a witness protection program;[6] and (5) was uncooperative with defendant's investigator.

In support of his defense, defendant points out his testimony put the murder weapon in Breaux's hands two weeks before the murder and revealed Breaux as a doorman for drug dealing and prostitution activities. Both Valenzuelas' testimony impeached Breaux's description of defendant's truck, and Rosa's testimony challenged Breaux's ability to see what he claimed to have seen from his claimed location. And Luna testified she heard Breaux's associates claim that Breaux told the police that defendant had killed someone "they had killed."

In closing argument, defense counsel (1) reminded the jury defendant testified he traded the murder weapon for drugs or prostitution "with none other than the People's star

---

6    Breaux testified that someone punched him in the face and told him he needed to learn to keep his mouth shut.

witness Melvin Breaux"; (2) argued "something was going [on] out there" and "Mr. Breaux was involved in it"; (3) insinuated Breaux was falsely accusing defendant "to get a roof over his head"; and (4) noted the prosecutor elicited that Breaux suffered a felony conviction for burglary in 2000.

During defense counsel's cross-examination of Breaux, counsel requested a sidebar conference regarding an additional impeachment topic related to the prosecutor's disclosure at the preliminary hearing that Breaux was being investigated for domestic violence.[7] Defense counsel wanted "to inquire of [Breaux] whether or not he has received a direct or implied immunity from the prosecution . . . from that criminal act because of his role here in this case." The prosecutor responded she had been "constantly checking" on the stalking matter and nothing had been submitted by police to the district attorney's office for prosecution. The prosecutor "unequivocally" represented that Breaux had received "[a]bsolutely nothing" in the stalking matter in exchange for his testimony in defendant's case. The court tentatively ruled defense counsel could not

---

[7]    Immediately after counsel stated their appearances at the preliminary hearing, the prosecutor made the following disclosure regarding the investigation of Breaux: "[H]e has a domestic violence case. I believe it is felony level. I don't know. It is being submitted to our office. Nothing has been issued or rejected. So I have spoken with him, not about the case specifically, but I wanted to make sure that [defense counsel] was aware there may be a potential DV case. I know nothing about the facts. I don't have a police report. I don't know whether or not the potential crime could be moral turpitude or not. I just want to make sure that it is on the record. But I have advised him that should he be asked about it in any way, he probably should assert the Fifth. We may need to appoint counsel. I just wanted to make that very clear, that there is potentially a pending case, may not be—"

cross-examine Breaux on the pending investigation, but directed the prosecutor to make an affirmative inquiry of the police to determine the status of the investigation.

Defense counsel later informed the court the prosecutor had put him in touch with the detective investigating the stalking claim (San Diego police detective Kevin McNamara), but the detective would not answer his questions due to confidentiality concerns. The court directed the prosecutor to produce McNamara for examination in court.

Detective McNamara testified in an evidentiary hearing outside the jury's presence. He testified he was investigating allegations by Breaux's ex-wife that Breaux had stalked her, but Breaux had not been arrested yet. When the judge asked a series of questions about whether any law enforcement agents or prosecutors had interfered in any way with McNamara's investigation or sought to provide Breaux with immunity on the stalking claim, McNamara responded "[a]bsolutely not." McNamara testified the current case against defendant would in no way impact his decisions as to the handling of the stalking case.

McNamara explained his investigation had been delayed by several factors. First, when he learned Breaux was under the "control" of the detectives handling defendant's case, McNamara purposefully refrained from contacting Breaux to avoid "mix[ing] the two cases." Second, McNamara's assignment in the police department changed and he was handling higher-priority matters. Third, McNamara had recently learned of some additional information that he thought would be "extremely probative to the [stalking] case," but he preferred not to divulge it in open court. Despite the delay in his

11

investigation, McNamara emphasized, "It's not only my intent [to ultimately forward the case to the district attorney's office for prosecution], but under oath it will be done."

On cross-examination, McNamara explained he had never talked to Breaux nor told him about the investigation, but he "would not be surprised if Breaux knows about the allegations" because Breaux's daughter knows generally of them and is in contact with both of her parents.

The court briefly examined McNamara in camera and sealed the transcript. On the record, the court stated, "I have interviewed Detective McNamara regarding what he called a recent piece of information that has affected his processing of this case. And he's revealed that to me and that I find is no way relevant to any matters that are pending before this court on this case."

Defense counsel argued that because Breaux was being investigated for stalking his ex-wife, defendant has "a right to see whether or not the information gathered by [McNamara] on Mr. Breaux has any probative or relevant information that will support our defense" theory that "Breaux is framing [defendant] for this murder . . . ." Defense counsel also wanted to further explore whether Breaux had received any immunity deal or was shading his testimony in this case in hopes of getting one.

The court denied both defense requests, noting the "purpose of this hearing was limited" to the issue of "whether there is a deal offered to Breaux; immunity, leniency, potential plea bargains in the future on the case Detective McNamara is working on." The court found "McNamara was very, very plain he's had no interference, no prompts, no requests from anybody in the D.A'.s office on how to deal with his DV case . . . . So

12

I'm not going to allow Breaux or Detective McNamara to testify. I'm convinced there are no deals."

The court also denied defense counsel's request for discovery of McNamara's investigative findings. The court refused to allow the case to "spin off in that direction" when trial was "almost finished" and the stalking allegations were not "relevant to what we're dealing with in this case . . . ."

B. *No Error in Not Disclosing the Information McNamara Revealed In Camera*

Having since read the sealed transcript, defendant now contends the trial court erred by not disclosing the following information that Detective McNamara revealed during the court's in camera examination:

> "I know that Mr. Breaux used to be a New Orleans police officer and he was involved in an on-duty accident. He got addicted — this is coming from the victim — he got addicted to the pain meds. They moved out of New Orleans, actually came to California. He tried to become a CHP officer, but he was turned out during the psychological for some anger issues. [¶] In my opinion, Mr. Breaux's got a great amount of street sense."

Defendant asserts the trial court's receipt of McNamara's testimony in camera is analogous to a trial court's in camera review of law enforcement personnel files under a *Pitchess* motion.[8] We review these determinations for an abuse of discretion. (*People v.*

---

[8] "[T]he Legislature has enacted procedures to implement the decision of *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 . . . , that allow criminal defendants to seek discovery from the court of potentially exculpatory information located in otherwise confidential peace officer personnel records. If a party bringing what is commonly called a *Pitchess* motion makes a threshold showing, the court must review the records in camera and disclose to that party any information they contain that is material to the underlying case." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 705 (*Johnson*).)

13

*Hughes* (2002) 27 Cal.4th 287, 330; see *In re Elijah S.* (2005) 125 Cal.App.4th 1532, 1541 [abuse of discretion standard applies to review of trial court's decision to allow access to confidential juvenile records under Welf. & Inst. Code, § 827, subd. (a)(1)(P)].)

Assuming without deciding that analogizing to the *Pitchess* framework is appropriate, we conclude the trial court did not abuse its discretion by finding Breaux's status as a former police officer, his workplace injury and resulting addiction to pain medications, and his alleged anger management issues immaterial to this case. To the extent Breaux's employment experience and workplace injury contributed to his "street sense" or potential problems with his powers of observation or recall, the trial court did not preclude defendant from cross-examining Breaux on these grounds generally. Indeed, as noted above, defense counsel extensively cross-examined and impeached Breaux. Additional detail about Breaux's background would not have materially aided that effort.

We also reject defendant's contention that Breaux's alleged history of anger management issues "would directly have impacted the defense theory that Breaux could have been the killer and was framing [defendant]." As propensity evidence, the trial court could properly have concluded Breaux's history of anger was inadmissible character evidence. (See Evid. Code, § 1101, subd. (a) [subject to certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion"]; *People v. Elliott* (2012) 53 Cal.4th 535, 580 (*Elliott*) ["Evidence of a third party's prior crimes is

14

inadmissible to establish the third party's criminal propensity."].) As third party culpability evidence, the trial court could properly have concluded Breaux's alleged history of anger issues is not sufficiently related to the manner in which Craig was murdered so as to identify Breaux as the real perpetrator. (*Elliott*, at pp. 580-581 ["For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, ' "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' "].) Either of these bases supports the trial court's exercise of discretion.

Because we find no abuse of discretion in the trial court's determination that defendant was not entitled to disclosure of the information that Detective McNamara revealed during his in camera examination—because it was in "no way relevant to any matters that are pending before this court on this case"—we likewise find no abuse of discretion in the trial court's denial of defendant's request to obtain the same information by way of discovery of McNamara's investigative file.

C. *No Error in Precluding Impeachment of Breaux with the Investigation*

In a similar challenge, defendant contends the trial court "erred by refusing to allow [defendant] to impeach Breaux with evidence of the pending investigation [of] his acts of stalking his ex-wife." Defendant asserts he was entitled to use the information to (1) show that because Breaux was allegedly stalking his wife, he "had a proclivity to at least some form of violent or aggressive behavior," and (2) explore Breaux's motive in "garner[ing] better treatment" from the prosecution. We conclude the trial court validly

15

exercised its discretion to prevent the case from "spin[ning] off" into a mini-trial on McNamara's investigation of Breaux.

First, defendant's "proclivity" theory is simply a repackaging of the propensity and third party culpability theories we rejected above.  Second, since "evidence of *mere arrests* is inadmissible because it is more prejudicial than probative" (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523, italics added), evidence of Breaux's *mere investigation* is likewise inadmissible.  Third, the trial court thoroughly explored whether Breaux had received direct or implied immunity:  McNamara and the prosecutor assured the court Breaux received "[a]bsolutely nothing" in the stalking matter in exchange for his testimony in defendant's case, and McNamara testified he purposefully avoided "mix[ing] the two cases" and vowed to eventually refer the matter for prosecution.  The court was not required to take further evidence on this collateral credibility issue.  (See *People v. Wheeler* (1992) 4 Cal.4th 284, 296 [Evid. Code, § 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues"].)

D.  *The Prosecutor Did Not Violate Her* Brady *Disclosure Obligations*

Defendant contends the prosecutor violated her *Brady* obligations by failing to disclose the substance of McNamara's investigation of Breaux.  We disagree.

"Under *Brady, supra*, 373 U.S. 83, and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*Johnson, supra*, 61 Cal.4th at p. 709.)  "The duty to disclose 'exists even though there has been no request by the accused.' " (*Ibid*.)  "For

16

*Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial." (*Id.* at pp. 709-710.)  This "requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)

The scope of a prosecutor's *Brady* disclosure obligation " 'extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others acting on the government's behalf." ' " (*In re Steele* (2004) 32 Cal.4th 682, 696-697 (*Steele*).)  "Thus, the prosecution is responsible not only for evidence in its own files but also for information possessed by others acting on the government's behalf that [was] gathered in connection with the investigation.  But the prosecution cannot reasonably be held responsible for evidence in the possession of *all* governmental agencies, including those not involved in the investigation or prosecution of the case." (*Id.* at p. 697.)  " 'Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information.  Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material.' " (*Ibid.*)

17

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)  We review de novo whether a defendant has established a *Brady* violation.  (*Salazar, supra*, 35 Cal.4th at p. 1042.)

Our independent review of the record reveals the prosecutor did not violate her disclosure obligations under *Brady*.  First, she was not obligated to disclose the substance of McNamara's investigation because he was not part of the prosecutorial team.  (See *Steele, supra*, 32 Cal.4th at p. 697.)  McNamara is a detective with the San Diego Police Department; Craig's murder was investigated by the Chula Vista Police Department.  The San Diego Police Department's only apparent involvement in defendant's case was the initial traffic stop by the two patrol officers who detained defendant until Chula Vista police officers arrived.

Second, the prosecutor was not obligated to disclose the substance of the investigation because, as discussed in part I.B., *ante*, we agree with the trial court's conclusion that the information defendant sought is not material.  (See *Johnson, supra*, 61 Cal.4th at pp. 709-710.)

Finally, and in any event, even if the prosecutor were obligated to disclose Breaux's investigation, she satisfied that obligation.  She disclosed the investigation at the very outset of the preliminary hearing; "constantly check[ed] its status"; put defendant's counsel in touch with Detective McNamara; and produced McNamara for examination by

the court *and defense counsel*.  By doing so, the prosecutor satisfied any *Brady* obligation she had with respect to the substance of the investigation.  (See, e.g., *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 59 [defendant's interest "in ensuring a fair trial can be protected fully by requiring that the [child protective services'] files be submitted only to the trial court for *in camera* review"]; *Johnson, supra*, 61 Cal.4th at pp. 706, 715, 722 [no *Brady* violation where prosecutor disclosed that police witness had " 'material in his . . . personnel file that may be subject to disclosure,' " where defense counsel has the same ability as the prosecutor to subject the personnel file to in camera review with a *Pitchess* motion].)

## II.  *Preservation of Defendant's Blood Alcohol Level*

Defendant moved under *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51 to dismiss the case (or, alternatively, for an ameliorative instruction and an evidentiary hearing) because "the police violated [defendant's] due process rights by failing to obtain samples of his blood to determine his level of intoxication at the time of arrest."  He asserts a blood sample may have supported an affirmative defense of intoxication.  We find no error.

The two San Diego police officers who followed defendant from Clairton Place to Hollister Street and initially detained him that afternoon testified defendant did not swerve while driving.  When standing within a foot of defendant, they smelled no odor of alcohol and observed no other signs of intoxication.  The Chula Vista police officer who took defendant into custody and transported him to the police station testified he was in

19

defendant's presence for over one hour and smelled no odor of alcohol and observed no other signs of intoxication.

When Detectives Varga and Cruz interviewed Macagno on the afternoon of June 3, Macagno told them he and defendant had been drinking bourbon that day and defendant appeared "plastered." Macagno said there were two empty bottles in the trash can at his house. Detective Cruz testified that, because of this, he closely observed Macagno for signs of intoxication and observed none. This caused Cruz to doubt Macagno's statement about the quantity of liquor the men had consumed.

Nevertheless, Cruz and Varga paid particular attention to defendant's demeanor when they interviewed him later that night. Cruz testified defendant responded promptly to commands; walked normally down a 30- or 40-foot-long hallway while handcuffed; and gave off no odor of alcohol and displayed no other signs of intoxication. Based on his observations, Cruz testified, "If this contact had occurred out in the field and he was driving under the same circumstances . . . , I would have handed him his keys back. That is how confident I was that he was not under the influence." Cruz concluded he would not have had probable cause to obtain a warrant to draw defendant's blood. Detective Varga similarly testified he did not detect the odor of alcohol emanating from defendant or observe any other signs of intoxication.

During his interview, defendant told Detectives Varga and Cruz he had only "a couple shots" of bourbon and boasted of being sober for six months. At trial, however, defendant testified he was drunk on bourbon and high on heroin and methamphetamine on June 3, including during his interview with detectives.

20

The trial court denied defendant's motion to dismiss, but allowed defendant to argue the police were "incompetent" in their treatment of the issue and instructed the jury on voluntary intoxication.

Defendant acknowledges his challenge "in part has been addressed" by the California Supreme Court's recent decision in *People v. Montes* (2014) 58 Cal.4th 809 (*Montes*), but requests "the extension of existing precedent." No extension is warranted here.

*Montes* acknowledged that although "due process does not require the police to *collect* particular items of evidence," *Trombetta* recognized that due process does impose "a duty on the state to *preserve* 'evidence that might be expected to play a significant role in the suspect's defense.' " (*Montes, supra*, 58 Cal.4th at p. 837, italics added, quoting *Trombetta, supra*, 467 U.S. at p. 488.) However, for the obligation to preserve evidence to arise, the "evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " (*Montes,* at p. 837, quoting *Trombetta,* at p. 489.) "A trial court's ruling on a *Trombetta* motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling." (*Montes*, at p. 837.)

The defendant in *Montes* moved to dismiss under *Trombetta* on the ground the police should have taken a blood sample when they arrested him, which may have supported an intoxication defense. (*Montes, supra*, 58 Cal.4th at p. 837.) The Supreme Court concluded the trial court properly denied the motion because, even assuming

21

*Trombetta* imposed a duty to *collect* apparently exculpatory evidence, there was none because (1) the arresting officers testified they did not believe the defendant was under the influence of drugs when they arrested him 24 hours after the murder, and (2) the record "failed to establish an apparent exculpatory connection between the possible presence of a narcotic in a defendant's blood when he was arrested and his level of intoxication, if any, when the murder was committed nearly 24 hours earlier." (*Id.* at pp. 837-838.)

*Montes* is controlling here. Five law enforcement witnesses testified uniformly that there was nothing apparently exculpatory about defendant's condition at the time of his arrest or interrogation. This alone is dispositive. Further, defendant offered no evidence of the exculpatory value of his intoxication level hours after Craig's murder. Because the officers who detained and transported defendant observed no signs he was intoxicated, the first suggestion defendant had been drinking arose during Macagno's interview sometime after 6:00 p.m. (about three hours after the murder). Defendant did not tell anyone he had been drinking until after 10:30 p.m. (about seven hours after the murder), and even then he downplayed his consumption. This substantial evidence supports the trial court's ruling.

*Montes* and *Trombetta* aside, the trial court instructed the jury on intoxication and defense counsel vigorously cross-examined the law enforcement witnesses regarding their conclusions defendant was not intoxicated. The trial court did not err in denying defendant's motion to dismiss.

22

III. *Exclusion of Defendant's Expert Witness*

Defendant contends the trial court erred by excluding an expert on homicide investigations who would have testified that police should have taken a blood sample from defendant. We disagree.

Near the close of the prosecution's case, the trial court confirmed its understanding that the defense would be calling only two impeachment witnesses (Bertha Luna and Rosa Valenzuela). Defense counsel responded, "[Y]eah, I think I should add a third; [defense investigator] Tira" as an expert on homicide investigations. Defense counsel made an offer of proof that Tira worked as a homicide investigator for the Indio Police Department before becoming a defense investigator.

The prosecutor objected on the ground of untimeliness. She explained she had confirmed several times—via discovery requests, a confirming letter, and a motion in limine—that defense counsel would not be calling any witnesses, other than possibly calling defendant. The court stated that it recalled from motion proceedings that defense counsel stated he did not intend to call any witnesses. The prosecutor acknowledged that defendant was not required to disclose impeachment witnesses, but said she felt "sandbagged" by defendant's belated attempt to designate an expert witness.

The trial court denied defendant's attempt to designate Tira as an expert witness. The court found there was no reason defendant could not have designated his expert sooner, and that the delay in doing so prejudiced the prosecution. Nevertheless, the court allowed defendant to argue the investigation had been conducted incompetently with regard to collecting a blood sample from defendant.

23

Defendant properly acknowledges we generally review a trial court's discovery ruling for an abuse of discretion (*People v. Ayala* (2000) 23 Cal.4th 225, 299), but he argues that because "the scope of that discretion is circumscribed by [his] due process rights and his right to a fair trial," "any perceived timing error in disclosing the witness had to bow to [his] right to present a full defense." We are not persuaded.

The trial court's ruling did not preclude defendant from presenting a full defense. First, defendant's primary theory at trial was that someone else killed Craig. Excluding an expert who would have testified the police should have taken a blood sample had no bearing on this defense. Second, to the extent defendant had an alternate defense theory of intoxication, defendant vigorously pursued the defense at trial even without an expert, and the trial court instructed the jury on the defense. There was no abuse of discretion.

IV. *Presentence Custody Credits*

Defendant contends the trial court miscalculated his presentence custody credits. He was arrested on June 3, 2013, and sentenced 383 days later on June 20, 2014. However, the trial court credited him with only 382 days of presentence custody credits. Defendant asks that the abstract of judgment be amended to reflect one additional day of presentence custody credits. At oral argument, the People agreed defendant is entitled to one additional day of presentence credit.

Although such a request should ordinarily be addressed to the trial court in the first instance (§ 1237.1), because we are already addressing other appellate issues we will address this request in the interests of economy (see *People v. Jones* (2000) 82

24

Cal.App.4th 485, 493). We will direct the trial court to amend the abstract of judgment to reflect one additional day of presentence custody credits.

## V. *Cumulative Error*

Because we have found only one instance of error (miscalculation of defendant's presentence custody credits), we reject defendant's claim that cumulative error requires reversal of his conviction. (*People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error, thus there is no cumulative error."].)

## DISPOSITION

The superior court is directed to amend the abstract of judgment to reflect one additional day of presentence custody credits (for a total of 383 days) and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

HALLER, J.

WE CONCUR:

BENKE, J., Acting P.J.

McINTYRE, J.